Case number 15-5034, Prince Johnson Appellant v. Thomas E. Perez, Secretary, Department of Labor. Ms. Ralston for the Appellant, Mr. Tate for the Appellee. Mr. Tate for the Appellant, Hecher and Mr. Devon. She was not privy to the conversations that revealed the defensive and argumentative demeanour that so many of the witnesses have pointed to. So given all of that, in our view the District Court got it right here there's just not enough evidence in the record to call these explanations into question. I would like to talk about what I think is the most confusing part of this case which is how did this conversion status issue arise? And going through the record it's pretty clear what happened. The initial appointment is for 60 days. That lapsed on June 1st of this particular year. At JA 274 there is a document dated May 25th, so about a week before this provisional status was supposed to end, that it's an SF 50 in which an HR officer classifies him as career conditional as of June 2nd. This was not signed by Mr. Burke, there's no evidence that he ever saw it. But several weeks after apparently HR thought that he was going to become career conditional, on June 30th this HR employee came to Mr. Burke, maybe it's the end of the month and payroll had to happen, and said verbally it's urgent he sign this. That was his testimony, that there was verbal pressure, but it's not just oral testimony, it's documented. The email that plaintiff's counsel cited, which is at Joint Appendix 276, says the Office of HR Consulting and Operations urge you to please respond as soon as possible, as soon as possible it says, in order to process the action so the employee can receive salary payment. Now it didn't say, and I think this is the source of the confusion, it didn't say would you like to convert him to career conditional or would you like to extend his provisional status. That was not a choice presented to him, but it clearly was a choice because in Joint Appendix 277 ultimately they did extend his temporary appointment for a year. He didn't make it to the end of that year, but that was an option. I think the confusion here and the explanation is that he got this pressure saying that he needed to sign this converting the individual to a career conditional, but there was another option out there, that is extending the temporary status, and he didn't understand why he was getting pressured in this one direction. Assuming that the district court might have somewhat overstated the implications of our as self-serving and therefore to be discredited, why can't we take the plaintiff's own testimony that he worked well and timely and didn't commit an excess of errors on any of the projects that the employer was criticizing? Why doesn't that alone create a material issue effect? After all, these are the two parties to these transactions. Well, the question ultimately is whether any reasonable jury could find that based on the evidence in the record that a plaintiff would carry this burden of proving discrimination on the grounds of an impermissible factor. Here, the evidence is overwhelming, but that doesn't respond to your question exactly, because you say, well, why couldn't the jury just disbelieve all of that? The issue is that there's nothing in the record, nothing in plaintiff's testimony, nothing in anybody else's testimony, and this is what the district court picked up on, that ties any of this to any racial grounds or any other impermissible grounds. And that's ultimately the question. Well, isn't he allowed to, as part of raising an inference of discrimination, to say the reason that they've given is a hollow reason, and this court has said in numerous cases, including in our en banc decision in ACCA, that an inference arising from a false profit reason can be a pretext for discrimination, and that, in some cases, can alone be enough. So if he's saying, no, I did everything on time, and I did a high quality of work, and I learned and I got better, and they're making that up, surely that can be enough. And what about his response is inadequate, assuming that a jury has to be the ultimate decision maker on whether his response is to be believed? As a practical matter, Your Honor, I'm unaware of any discrimination case in which the plaintiff agrees with the reason that the employer provides. In every case, the employee testifies under oath that they did a great job. No, not necessarily. I mean, sometimes people are testifying under oath, and I mean, what about a case if instead of talking about late and error-prone work, what if Mr. Johnson said, when everybody else went home, they gave me a broom and told me, you know, because I'm a black man, I should sweep up, and he's the only person there, and there are no cameras, and he has to testify. That's what happened, and the employer says, no, that never happened. I mean, of course we rely on the plaintiff's testimony and have to let that go to a jury. And I guess the question is, what – I mean, there may well be something different, but I'm just asking for your help on what – if he's saying, no, no, I did my work well, or did he not so say? Did he not ever say, I did my work well? He did not rebut these specific instances. Like, for example, Mr. Gavin, JA-255, said that 11 versions of a spreadsheet were required to be produced. He didn't say that that's not true. Or give an alternative explanation. Right. I mean, maybe his view is that Gavin was unreasonably demanding or exacting. But he didn't say that either. No, he didn't say that either. And it's true for each of the instances here. Now, the problem with a lot of these things, particularly the demeanor issues, is that these are oral conversations. I mean, people are not saving iterative drafts of documents because one day this may wind up in court. This is the sort of thing that you have to look to who is saying things. And it's not just those supervisors who – again, this is why same-actor inference is important here, because the two people who – the two supervisors who fired him hired him. And Mr. Burke, I mean, he's in the same protected class, and he essentially recruited the guy and helped him to apply. We get no explanation at all from the plaintiff as to why he suddenly would turn on a dime and start discriminating against another black man. Just – in some, Your Honor, it just doesn't add up here. I find the somewhat troubling – and I'm not sure that I've been able to discern precisely the race or ethnicity of each of the actors in the case, but it does appear that there's something of a pattern of the people who found him to be defensive and was quite agreeable and professional in his demeanor were typically, I think, minority. Is that accurate? And what should we make of that? It's not accurate, and I think one should make relatively little out of it. It's not accurate because Mr. Burke himself is an African-American man. And he personally, according to his testimony, witnessed the demeanor issues on multiple occasions and the performance issues. Same actor inference applies to him, and he is a black man. Past that, I'm not sure that I have much to work with. I have no control, obviously, over the races of the people who happen to be working around him. But the point, I think, more broadly is that of the people who worked with him as a colleague or as a supervisor, nobody disagrees with these assessments, or virtually no one does, that there were these problems that were reported. Well, that's on the performance. I'm talking about the demeanor issue. And there also is the sort of converse demeanor issue of the supervisors who some of the employees testified they thought supervisors talked down to him, that they were belittling, that they were harsh in a way that at least the observing employee was willing to testify under oath seemed biased to them. And what do we make of that? Two responses. First of all, the people who were talking down, that mostly refers to Mr. Hecker, who is this guy with the loud voice. He got deafened by helicopters in the military. One of the coworkers, Ms. Morrison, who's their witness, testified sort of the opposite. She said that Johnson was curt and disrespectful to Hecker, and she said, I know Hecker was getting very frustrated, but never did I hear him take it out on Mr. Johnson. But even if Hecker is talking down to people, quote, unquote, first of all, there's no more hostile work environment playing in this. And as far as we're aware, the fact that somebody is, quote, talking down, that's not an adverse action. Most of it's a hostile work environment thing. But coupled, I mean, it could be part of circumstantial evidence of bias. Clearly, if we're talking about someone not being retained as an employee, that's the adverse action. Well, Mr. Burke has none of that testimony against him. He's not accused of talking down to anyone. Ms. Langley has very little of it, if any. And they're the ones that actually made the decision here. They're the ones whom the same actor inference applies to. There's no evidence in the record that Mr. Dabin talked down to anybody. There's no evidence that Mr. Golofsky at this conference that plaintiff went MIA at, that he talked down to anybody. And so it's clear, yes, some of the coworkers said that they perceived, and they said it in sort of a conclusory fashion, we don't have any quotations of this. We don't have any documents of this. I got the impression that I was treated differently. But that is a conclusory statement, that things were different for me than they were for other people. And that, I think, does fall squarely under just unsubstantiated testimony and characterization. So I think whichever way you turn here, the reason the district court got it right is that one can quarrel with a particular supervisor or coworker statement on a particular day, but there are five or six witnesses testifying consistently to each of the problems that are reported here. Did the district court get it right in saying that the explanations did shift over time? The district court says, you know, there were shifting explanations, but I can't tie that to race, and therefore... We think the district court was charitable to plaintiff in describing them as shifting. They were not identical, but they were not inconsistent either. When you say they were not identical, what are you referring to? Well, for example, there's an answer. One of the answers, they asked... In the complaint, it said, Mr. Burke gave conflicting statements. Originally, he said his stated reason was to support the supervisor, but later he said he cannot do the work. But we agreed with the statement that he said it was to support the supervisor, but we didn't agree that that was the only reason. And that's what they latched onto there. In the termination memo, which Mr. Burke signed, it gave three reasons. It gave performance deficiencies, it gave demeanor deficiencies, and there was a third one, I believe, also. That was the very first thing that Mr. Burke communicated, and it was an all-of-the-above sort of response. And based on questions and answers, yes, depending on what the record needed to be clarified upon, his later declarations and testimonies emphasized one aspect above another one, or maybe exclusively. But that doesn't mean that his initial all-of-the-above answer was untrue. He's just expanding on prior things, where he said that he had demeanor problems and he had professional competence problems. And then later he said, yes, I personally have witnessed these things. And yes, I did it to support the supervisor, too. But there's nothing wrong with a manager supporting a supervisor if the manager agrees with the observations that the supervisor has made. The supervisor reported the same problems. That is, Ms. Langley reported observing the same problems as Mr. Burke did. So to support the supervisor's views when he himself holds those same views, that's not inconsistent. That's what one would hope a manager would do. Done. Done. Okay. Thank you. Let's see. Ms. Raulston, I think you are out of time, but you can take two minutes. Thank you. I just wanted to address really quickly Mr. Tate's comments about the conversion in terms of Mr. Burke feeling this pressure and that he didn't know that he had an alternative to extend the temporary appointment because it states specifically, if you have any questions about this, call this person, which he didn't. And he also writes back. I'm sorry, what? It states that if he has any questions, and it gives a person to contact if he has any questions about what they're asking of him. And it also states, he writes back in no uncertain terms, I want him to be converted to career conditional, which his testimony The memo does suggest that it's that or the pay stops. Right. But his testimony says that he didn't understand that he was converting him to career conditional and that he didn't have any clue that that's what he was doing. But his statement directly states that. And I think that it's His statement directly states what? His email says, I would like to request to convert Mr. Johnson to career conditional. And he testifies later that he had no idea that what he was doing was converting him. The same actor defense, I think, has been really briefed in all of the writing. But Langley is the one who recommended the termination. That is not disputed. She is the one who recommended that the career conditional be rescinded. She is the one who had the input in the termination letter. I mean, Burke seems to have had plenty of direct exposure to Johnson. Right? Burke? You say that Johnson testified that he did a great job. But is there any place where he tries to go by the specific assertions of low grade performance that the government witnesses offered? In terms of Mr. Johnson's deposition, I recall there's portions of it where he said that he was given assignments late and told to do things and it was conflicting directions and he wasn't sure and he would ask for follow-up and he would get yelled at. And the record is also clear that when he asked Mr. Hecker for guidance, that Mr. Hecker, he felt, was condescending and yelling at him and that he had meetings with him and would leave because he was upset and didn't know how to communicate and he felt that he was not being assisted. But he did try to, you know, get whatever feedback from him to be assisted. Mr. Hecker's testimony did not identify that Mr. Johnson was the worst employer. He was terrible and all of his work on it was awful. And he was not, he addressed the fact that he also thought that Langley was not giving him any guidance in terms of his work performance. But I wanted to just also make the point that Mr. Tate had mentioned that there are a majority of employees that support that, you know, Mr. Johnson was not, I guess, good at his work or had an argumentative demeanor, but that is not true. The majority of the employees do support Mr. Johnson, that he was always compliant. But again, the concern of the employer was that he was argumentative with his supervisors. What? With his supervisors, not with co-workers. Right. That wasn't the reason for terminating him. They did say that he was argumentative with his peers and co-workers and that his argumentative demeanor was toxic to the workforce or because of that. And that was not supported. I mean, there were the one person that said that he was mean to Hecker, but for the most part, everyone said that he was very professional, social, hardworking, and did a good job. And in closing, really, there are disputed facts here. And there are issues here that credibility should be weighed. And so we are requesting. Okay. Thanks. Thank you. Both the cases submitted.
judges: Tatel, Pillard, Williams